**TOWN OF ST. JOHN, et al., James K. Gilday, Dimple Clarine Shelton and William E. Wise, Petitioners,**

v.

**STATE BOARD OF TAX COMMISSIONERS, Respondent.**

No. 49T10–9309–TA–00070.

Tax Court of Indiana.

Dec. 22, 1997.

**372** ∎ 

Thomas M. Atherton, Dutton Overman Goldstein & Pinkus, Indianapolis, Peter H. Donahoe, Hill Fulwider McDowell Funk & Matthews, P.C., Indianapolis, James K. Gilday, Wood Tuohy Gleason Mercer & Herrin, Indianapolis, Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, Richard A. Waples, Indianapolis, for Petitioners.

Jeffrey A. Modisett, Attorney General, Jon S. Laramore, Deputy Attorney General, Indianapolis, Marilyn S. Meighen, Deputy Attorney General, Indianapolis, for Respondent.

FISHER, Judge.

The Town of St. John, James K. Gilday, Dimple Clarine Shelton, and William E. Wise (Petitioners or the Petitioners) challenge the constitutionality of Indiana's real property

taxation system. In *Town of St. John v. State Bd. of Tax Comm'rs*, 665 N.E.2d 965 (Ind.Tax Ct.1996) (*St. John I*), this Court held that Article X, section 1 of the Indiana Constitution requires a system of real property taxation based solely on fair market value. The Indiana Supreme Court reversed this holding and remanded the case to this Court to determine whether the True Tax Value system results in a uniform and equal rate of assessment and a just valuation based on property wealth. *Boehm v. Town of St. John*, 675 N.E.2d 318 (Ind.1996) (*St. John II*). On remand, this Court holds that Indiana's property taxation system violates the Indiana Constitution.

## ISSUES

I. Whether the True Tax Value system fails to secure a just valuation of property and fails to value property equally and uniformly based on property wealth in violation of Article X, section 1 of the Indiana Constitution.

II. Whether the True Tax Value system fails to provide ascertainable standards rendering property tax assessments arbitrary and capricious in violation of the Due Course of Law Clause of Article I, section 12 of the Indiana Constitution.

III. Whether Indiana's True Tax Value system violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution on both procedural and substantive grounds.

IV. Whether Indiana's True Tax Value system violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## BACKGROUND:

## REAL PROPERTY ASSESSMENT IN INDIANA

In Indiana, real property [1] is assessed on an ad valorem basis. The standard of value

---

1. Real property is defined as:
 (1) land located within this state;
 (2) a building or fixture situated on land located within this state;
 (3) an appurtenance to land located within this state; and

 (4) an estate in land located within this state, or an estate, right, or privilege in mines located on or minerals, including but not limited to oil or gas, located in the land, if the estate, right, or privilege is distinct from the ownership of the surface of the land; and

used is statutorily defined as True Tax Value. IND.CODE ANN. § 6–1.1–31–6(b)(7) (West 1989). "[T]rue tax value does not mean fair market value ... [but rather] the value determined under the rules of the state board of tax commissioners." *Id.* § 6–1.1–31–6(c)

The State Board of Tax Commissioners (State Board) is an administrative agency created by the Indiana legislature. *Id.* § 6–1.1–30–1. It is required by law to: "(1) interpret the property tax laws of this state; (2) instruct property tax officials about their taxation and assessment duties; and (3) see that all property assessments are made in the manner provided by law." *Id.* § 6–1.1–35–1. The State Board's authority to effectuate the regulatory scheme is outlined in Indiana's property tax statutes. *See Miller v. Gibson County Solid Waste Mgmt. Dist.,* 622 N.E.2d 248, 259 (Ind.Tax Ct.1993). Accordingly, the State Board has promulgated regulations for determining the True Tax Value of real property. These regulations, collected in the Indiana Assessment Manual, are found in the Indiana Administrative Code, Title 50, Article 2.2 (Title 50).

Under Title 50, the True Tax Value of non-agricultural land (i.e., commercial, industrial, and residential land) is determined by a county land valuation commission and subsequently approved by the State Board. IND.ADMIN.CODE tit. 50, r. 2.2–2–1 (1996). *See also* IND.CODE ANN. § 6–1.1–4–13.6 (West 1989) (amended 1997). Each county has its own land valuation commission to collect and analyze sales data for the county and, on the basis of that information, the commission determines the values of the land contained therein. IND.ADMIN.CODE tit. 50, r. 2.2–4–5

(1996). These values are then either accepted by the State Board, or modified by the State Board without further input from the county commissions.[2] *See* IND.CODE ANN. § 6–1.1–4–13.6; IND.ADMIN.CODE tit. 50, r. 2.2–4–3(a) (1996). The State Board's final figures are then compiled in a County Land Valuation Order. In theory, the True Tax Value of non-agricultural land approximates its market value.

The True Tax Value of agricultural land is determined by a county agricultural land advisory committee. *See* IND.CODE ANN. § 6–1.1–4–13 (West Supp.1997). Each county has an agricultural land advisory committee. Unlike the county land valuation commission, however, this committee does not collect and analyze sales data for agricultural land within the county. Rather, it determines the True Tax Value of agricultural land by taking a base rate of $495 per acre and then making adjustments up or down to reflect the soil's crop production capacity. IND.ADMIN.CODE tit. 50, r. 2.2–5–6(5), 2.2–5–7 (1996)[3] As a result, the True Tax Value of agricultural land purports to approximate a value based in part on its earning capacity.

The True Tax Value of an improvement[4] is calculated by the "reproduction cost" of the item, minus any physical depreciation or obsolescence depreciation. IND.ADMIN.CODE tit. 50, r. 2.2–2–1(c) (1996); *see also id.* r. 2.2–7–9. Reproduction cost is defined as the "whole-dollar cost of reproducing the item." *Id.* r. 2.2–7–7.1(f)(8). The "reproduction cost" of an improvement, however, is not the *actual* cost of reproducing the item. Rather, it is the "reproduction cost" as specified in the State Board's cost schedules.[5]

---

(5) notwithstanding IC 6–6–6–7, a riverboat licensed under the provisions of IC 4–33 for which the state board of tax commissioners shall prescribe standards to be used by township assessors.
IND.CODE ANN. § 6–1.1–1–15 (West Supp.1997).

**2.** The fact that the State Board is given final say as to what land values will be, without further hearings before taxpayers, raises due course of law (due process) concerns. They are discussed in the due course of law section of the opinion. *See infra* note 31.

**3.** Other classes of land, such as windbreaks, filter strips, forest lands, and wildlife habitats, are specifically valued at $1 per acre. *See* IND.CODE

ANN. § 6–1.1–6.2–9 (West 1989); *id.* § 6–1.1–6.7–9 (West Supp.1997); *id.* § 6–1.1–6–14 (West 1989); *id.* § 6–1.1–6.5–8 (West 1989).

**4.** "Improvement" is a term of art that refers to buildings, fixtures, or appurtenances located on the land. *See* IND.CODE ANN. § 6–1.1–1–15.

**5.** The cost schedules effective for the 1989 general reassessment reflect 1985 reproduction costs (based on market information derived from Marshall Valuation Services price tables) that were then reduced across the board by 15%. *See St. John I,* 665 N.E.2d at 967 n. 5; Tr. at 676, 694–95, 703–09; STATE BD. OF TAX COMM'RS, INDIANA REAL

The cost schedules are divided into several basic classes: Residential Dwellings, *id.* r. 2.2–7–11, Mobile and Manufactured Homes, *id.* r. 2.2–8–7, Residential Yard and Agricultural Improvements, *id.* r. 2.2–9–6, Commercial/Industrial Improvements, *id.* r. 2.2–11–6, Commercial/Industrial Yard Improvements, *id.* r. 2.2–12–5, Special Use Commercial Properties, *id.* r. 2.2–13–8, and Unit-in-Place, *id.* r. 2.2–15–1. The regulations provide assessors with "models to help identify and define various classes of buildings." *Herb v. State Bd. of Tax Comm'rs,* 656 N.E.2d 890, 893 (Ind.Tax Ct.1995). These models direct the assessors to the applicable cost schedule. The schedules are made up of values (base prices in hundreds of dollars) that are then adjusted for various factors (additions, interior and exterior features, quality, grade, life expectancy, etc.). Such factoring may increase or decrease the value. Regardless of what category the property falls under, the only determination of value is made via the schedules. These cost schedules and adjustment factors are the only information that may be used in determining an improvement's True Tax Value.

In summary, True Tax Value is a figure produced by the application of a closed set of self-referential rules and formulas contained in Title 50. Everything needed to calculate True Tax Value is set forth in Title 50; evidence of value external to Title 50 is irrelevant. *See Dawkins v. State Bd. of Tax Comm'rs,* 659 N.E.2d 706, 709 (Ind.Tax Ct.1995); *See also* INSTITUTE OF PROPERTY TAXATION, PROPERTY TAXATION 159 (Jerrold F. Janata, ed., 2d ed. 1993). As a result, evidence of an improvement's actual reproduction cost or evidence of the actual value of land is irrelevant under the True Tax Value system.

## Article X, Section 1 and the Intent of the Framers

In *St. John II,* 675 N.E.2d at 324, the Indiana Supreme Court made it clear that the constitutional requirements of uniformity and equality provide judicially cognizable standards by which Indiana's real property taxation system may be evaluated. As the Supreme Court explained, "Article X, section 1 does not immunize legislative policy judgments from judicial oversight, but rather establishes mandatory minimum requirements for our system of property assessment and taxation." *Id.* The specific language used by the framers in the Indiana Constitution requires the legislature to provide for a "uniform and equal rate of property assessment and taxation," and to secure a "just valuation for taxation of all property, both real and personal." IND. CONST. art. X, § 1(a). Therefore, a crucial step in this Court's analysis of the current property tax scheme is to determine what minimum requirements the framers intended by using the "uniform and equal" and "just valuation" language.

■ In order to determine the intent of the framers in drafting our constitution, one must consider the "history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy." *St. John II,* 675 N.E.2d at 321 (citations omitted). There were two problems that led to the adoption of Article X, section 1.

First, under the tax system then in place, some property escaped taxation while other property did not.[6] Not surprisingly, this was considered unfair. Governor James Whitcomb stated, "[I]t is quite manifest that a large amount of the invisible wealth of our community . . . is not found upon assessment rolls. This description of taxables is generally owned by those *best able to pay.*" INDIANA HOUSE JOURNAL, 32d Sess. 125 (1848) (emphasis added). This observation was echoed by the comments of Daniel Read, the delegate to the Constitutional Convention who proposed Article X, section 1:

> There is manifest injustice in permitting property, in the hands of the wealthy, which ought to be taxed as other property,

---

PROPERTY ASSESSMENT MANUAL, Forward [sic] [Foreword] at I (approved and adopted 1986).

**6.** This is not a consideration in the present case. However, this complaint with the then current system demonstrates a concern that the tax levy fall on everyone in proportion to their property wealth. This *is* a concern in the present case.

to escape taxation altogether, or to be taxed only on a very small part of its value. It is to me a strange doctrine, that, in this country, a man may invest his money in any kind of stocks, and claim for it an exemption from taxation. It runs athwart all my *notions of justice and right,* that any one may live in our midst—may enjoy the full protection of Government—invest his money in the safest funds known in the country, and yet entirely escape taxation. He may, according to the doctrine, have the best fortune in Indiana, and pay on it not a dime to support the Government which surrounds him with safety.

1 Report of the Debates and proceedings of the Convention for the Revision of the Constitution of the State of Indiana 946 (1850) (emphasis added) [hereinafter Debates].

Second, under the tax system then in place, there was often a wide disparity in assessments of property. Delegate Read stated that he knew of farms "which were of equal value assessed at a difference of fifty perc., and farms of less value than others at a much higher rate." *Id.* Delegate Borden offered two similar examples. First, he stated that there was an estate assessed at sixty thousand dollars, but later appraised at its real cash value at three hundred thousand dollars. *Id.* at 950. He added a second example of property taxed at a value of one hundred thousand dollars, but "really worth" four or five hundred thousand dollars. *Id.*

It is readily apparent that concerns about the fairness of the then current taxation system animated the adoption of Article X, section 1 with its uniformity and equality provi-sion and its just valuation provision. The framers intended to make Indiana's property tax system fair with these new provisions.[7] The idea of fairness, however, does little to elucidate the question at hand, i.e., what judicially cognizable standards are provided in Article X, section 1.

Fortunately, the answer lies in how the delegates evaluated the system then in place. They evaluated its fairness, not by any rules of assessment, but rather based on a real world understanding about what the particular property was worth. They were not concerned with whether the law in place at that time dictated the unequal assessments.[8] *See id.* at 950. To them, the inherent fairness of property assessments was determined *with reference to real world values.*[9] The Supreme Court explicitly recognized that such a real world reference is a prerequisite to a constitutionally valid property tax system. "We think the constitution requires that property, wealth, substantial values should be taxed, but not imaginary values." *Florer v. Sheridan,* 137 Ind. 28, 42, 36 N.E. 365, 369 (1894) (language cited with approval in *St. John II,* 675 N.E.2d at 325). Real world values are the opposite of "imaginary values."

The writings of Thomas Cooley reflect the prevailing attitudes at the time of the framing. Cooley is largely regarded as the driving force behind the uniform and equal taxation principles of American constitutional law. *See* Morton J. Horwitz, The Transformation of American Law 1870–1960, at 21 (1992). Cooley believed that the power to tax was given to the government by the people and was a limited grant.[10] Cooley

---

**7.** *See* Brent E. Dickson, *Lawyers and Judges as Framers of Indiana's 1851 Constitution,* 30 Ind. L.Rev. 397, 405 (1997). In his law review article, Justice Dickson explains that the framers intended to remedy "all the evils of the old system." *Id.* (quoting *Greencastle Township v. Black,* 5 Ind. 557, 564–65 (1855)). Inequality in taxation is one of the evils expressly mentioned in *Greencastle Township.* *Id.* at 564.

**8.** One of the delegates, Mr. Hovey, stated that the anomalous assessments were the result of officials not following the law. Debates, *supra,* at 950. He asked whether any law of the State did not result in a uniform mode of taxation and assessment. *Id.* Apparently, a mere statutory

guarantee of uniformity and equality did not satisfy the framers.

**9.** It is important to remember that the framers were mostly "Hoosiers from all walks of life." Dickson, *supra* note 7, at 408. Presumably, they relied on their everyday experience and wisdom, rather than technical or arbitrary rules, to determine property wealth. In short, the framers' common knowledge of property and its relative worth guided their comments at the constitutional convention.

**10.** Taxes can only be voted by the people's representatives. They are in every instance an appropriation by the people to the government,

wrote that principles restricting the power to tax might seem unnecessary at first glance until "one considers how vast is this power, how readily it yields to passion, excitement, prejudice or private schemes...." *See* 1 THOMAS M. COOLEY, TREATISE ON THE LAW OF TAXATION, preface to 1st edition 1876 (3d ed. 1903) [hereinafter COOLEY, TREATISE]. Cooley understood that the government should tax property based only on its actual worth. This is because the people's grant to the government of the power to tax is a limited grant. This grant can only be given, in an ad valorem system, to the extent of each person's ability to pay. In property taxation, the person's ability to pay is naturally limited to the actual wealth he has invested in his property. The government cannot collect a tax from a citizen if that tax will be confiscatory. The delegates drafted Article X, section 1 of Indiana's Constitution with these ideas in mind.

### Uniformity and Equality

The State Board argues that "Indiana's current system is an effort to provide uniformity and equality between the portions of the tax burden borne by various classes of property, a kind of 'macro' uniformity and equality." (State Bd. Br. on Remand at 18). This assertion defies the unrefuted testimony of the State Tax Commissioners themselves. They testified at trial that they are unaware of any way under the True Tax Value system to measure whether there is equality among the various classes of property (Tr. at 150, 642, 912–13, 1479). Because the State Board does not know how to measure equality of taxation among the various classes of proper-

ty, for over thirty years no measurement of equality has been undertaken. (McIntyre Dep. Vol. II, at 52–53).[11] Although the State Board does not know how to measure equality of taxation and has never tried to do so, it asks taxpayers (and this Court) to accept as a matter of faith the contention that equality exists.

The requirement of uniformity and equality does two things: first, it requires that the property tax system be based on objectively verifiable data; second, it ensures that taxpayers have a means to evaluate the taxing authorities' assessment of their property. The use of objectively verifiable data is paramount in ensuring that the tax burden is distributed with uniformity and equality. *See Finney v. Johnson*, 242 Ind. 465, 179 N.E.2d 718 (1962); *Board of Comm'rs v. Johnson*, 173 Ind. 76, 89 N.E. 590 (1909). Support for this conclusion comes from the comments of the framers and the language of Article X, section 1 coupled with an understanding of ad valorem property taxation.

■ In any ad valorem taxation system, the value of any property must be converted into standard units of measure (i.e., dollar figures). Property is not fungible and not freely convertible. It follows that, in a system where the assessments are required to be equal and uniform, the method by which property is to be converted into dollar figures must be objective. There must also be a means of determining whether equal property has been assessed equally.[12] The State Board admitted at trial that it was impossible under the present system to determine the

which the latter is to expend in furnishing the people protection, security, and such facilities for enjoyment as it properly pertains to government to provide. This principle is a chief corner-stone of Anglo–Saxon liberty; and it has operated not only as an important check on government, in preventing extravagant expenditures, as well as unjust and tyrannical action, but it has been an important guaranty of the right of private property. Property is secure from the lawless grasp of government, if the means of existence of the government depend upon the voluntary grants of those who own the property.

THOMAS M. COOLEY, COOLEY'S CONSTITUTIONAL LIMITATIONS 517 (Boston, Little, Brown & Co. 3d ed. 1874).

11. There has been one study measuring equality of taxation: the DeBoer study. (State Bd. Ex. 64). When market values are used as the standard, equality of taxation and property wealth can be measured. Because the True Tax Value system eschews real world, objective data, no verification of either equality or uniformity of taxation based on property wealth is possible.

12. This necessarily follows from the fact that the Constitution guarantees a right of uniformity and equality. If there are no means to determine whether a right has been violated there is, in effect, no right at all.

system's compliance with the uniformity provision of the Indiana Constitution. (Tr. at 150, 642, 912–13, 1479). For this reason alone, the present system is unconstitutional. The State Board cannot create "an artificial distinction which results in an assessment which is not uniform.... " *State Bd. of Tax Comm'rs v. Polygram Records, Inc.,* 487 N.E.2d 444, 445 (Ind.Ct.App.1985). *See also State Bd. of Tax Comm'rs v. Pioneer Hi–Bred Int'l, Inc.,* 477 N.E.2d 939 (Ind.Ct.App. 1985); *State Bd. of Tax Comm'rs v. Lyon & Greenleaf, Inc.,* 172 Ind.App. 272, 359 N.E.2d 931 (1977).[13] Without objective methods of converting property wealth into dollar figures, there is no way to verify that the constitutional guarantee of uniformity and equality is being adequately met. How can that right be adequately protected if there is no way to check the assessments against real world data? With no objectivity, there can be no justiciable standards. One must ask, "Who is watching the watchmen?" [14]

Requiring uniformity and equality of assessments means that assessments will be based on objectively verifiable data. It is impossible to conclude that the framers, who evaluated the propriety of assessments according to their real world understanding of a property's value, would create a system where the real world is irrelevant to property assessment. Such is the system in place today. *See* IND.CODE ANN. § 6–1.1–31–6(c) ("[t]rue tax value is the value determined under the rules of the state board of tax commissioners."); *see also Dawkins,* 659 N.E.2d at 709–10 (reproduction cost for assessment purposes means reproduction cost as determined by regulation, not actual reproduction cost).

### True Tax Value, Objective Methods of Property Assessment and Just Valuation

The Indiana constitution provides for an ad valorem system of property taxation. *Bright v. McCullough,* 27 Ind. 223, 228 (1866). Ad valorem taxation has two steps; (a) the valuation of property through assessment, and (b) the application of the tax rate. 1 BONBRIGHT, VALUATION OF PROPERTY 451, 499 (1937). The Court must now determine whether the constitutional criteria of uniformity and equality are met by using separate cost schedules for different categories of property. The answer is no. The State Board's cost schedules, the heart of the True Tax Value system, do not result in the property valuations bearing any nexus with real world, objectively verifiable, measurements.

As noted previously, the cost schedules were generated by using the 1985 prices of items found in buildings reduced fifteen percent across the board.[15] Because the cost schedules were generated in accordance with real world data, it might be argued that assessments based on these tables comport with the constitutional mandate that assessments comport with real world values.

The problem with this argument is that it does not allow the objective verification of the assessment. It asks taxpayers to trust a valuation made in accordance with a system that rejects evidence of actual worth. This is contrary to the protections afforded taxpayers in our constitution. Taxpayers have a right to have their assessments evaluated to ensure that they meet the standard of uniformity and equality. Under the present system, this right is ignored. Assessments now are solely evaluated according to State Board

---

**13.** In *Wheeler v. Weightman,* 96 Kan. 50, 149 P. 977, 978 (1915), the court persuasively rejected a statutorily created "artificial distinction" in the property taxation arena:

> The Constitutional command is that the Legislature shall provide for a uniform and equal rate of assessment and taxation. Assessment is a prerequisite to the application of any rate of taxation, and assessment includes listing and valuation. This is fundamental, and cannot be evaded by any shift or device what[so]ever.

*See also District of Columbia v. Green,* 310 A.2d 848 (D.C.1973); *Beverly Bank v. Board of Review,* 117 Ill.App.3d 656, 72 Ill.Dec. 791, 453 N.E.2d

96 (1983); *State Tax Comm'n v. Wakefield,* 222 Md. 543, 161 A.2d 676 (1960); *Foss v. City of Rochester,* 65 N.Y.2d 247, 491 N.Y.S.2d 128, 480 N.E.2d 717 (1985); *Soo Line R. v. State,* 286 N.W.2d 459 (N.D.1979); *State ex rel. Park Inv. Co. v. Board of Tax Appeals,* 32 Ohio St.2d 28, 289 N.E.2d 579 (1972); *Fray v. Culpeper County,* 212 Va. 148, 183 S.E.2d 175 (1971).

**14.** *Quis custodiet ipsos custodes?* DECIMUS JUNIUS JUVENAL, SATIRES VI, at line 347 (W. Clausen, ed. 1959).

**15.** *See supra* note 5.

regulations.[16] The assessments, based on the State Board's cost schedules, are not tested in the crucible of comparison to objective data.[17]

By setting up a system whereby assessments are based on unchallengeable cost schedules the State Board has in fact implemented a system of valuation by fiat. The definition of value is not the exclusive province of the State Board. It has constitutional meaning apart from any statute or regulation. The job of the State Board is to secure a just valuation, not define what value is.[18] *See* IND. CONST. art. X, § 1(a). Because the present system does not allow comparison of assessments to objective data, it cannot satisfy the constitutional requirements of uniformity and equality in property assessment.

This holding is not inconsistent with *St. John II.* In reversing this Court's determination that Article X, section 1 requires adherence to fair market value in property assessments, the Indiana Supreme Court explained that although "a careful and accurate fair market value assessment may well be the system closest to our constitution's requirements for uniform and equal rates of assessment and taxation and for just valuation, a system based solely upon strict fair market value is not required...." *St. John II,* 675 N.E.2d at 327.[19]

Use of objective data will allow taxpayers and courts the ability to review assessments to determine whether they truly are uniform and equal as required by the constitution. However, under our system of taxation, the same valuation methods must be applied to similar properties. If this is not done, we are left without the ability to measure or compare similar properties to determine

---

**16.** The use of cost schedules is not in and of itself the problem. In a system where valuation is based on replacement costs minus depreciation, the use of some type of schedule is necessary. But any such schedules must get their value from a common, objective source so as to allow an evaluation for uniformity and equality. For administrative convenience, most states use some type of cost manuals such as STEVENS VALUATION QUARTERLY, DODGE BUILDING COST CALCULATOR & VALUATION GUIDE, BOECKH GENERAL ESTIMATE MANUAL, and MEANS APPRAISAL MANUAL, which are created and published by professional valuation services. The State Board's current cost schedules are not such an administrative convenience.

**17.** This was done by the DeBoer Commission, via a comparison of True Tax Valuation with real world, market information. The study demonstrated that the State Board assesses different types of property unequally. In terms of market value, residential property is assessed at 62% of market value, commercial property at 81%, industrial property at 72%, and agricultural property at 54%. (State Bd. Ex. 64C, DeBoer Report, Vol. III, 5). This is indicative of different valuation bases being used for different types of property.

**18.** This conclusion is buttressed by the observation that if the State Board has complete authority to establish the valuation in any manner it chooses, it has the de facto power to set the levy rate. This is a legislative power, as such cannot be exercised by the State Board. *See* IND. CONST. art. III, § 1. Allowing an administrative agency to influence the value of the taxation assessment has been tried and found unconstitutional in other states. *See Lunkenheimer Co. v. Board of*

*Revision,* 41 Ohio App.2d 27, 322 N.E.2d 133 (1974); *Killen v. Logan County Comm'n,* 170 W.Va. 602, 295 S.E.2d 689 (1982); John P. Ludington, Annotation, *Requirement of Full–Value Real Property Taxation Assessments,* 42 A.L.R.4th 676, 681 (1986):

> A state legislature can validly provide for either full-value assessments ... or fractional value assessments.... What a state cannot do is assess some property at full value and other property at a fraction of actual value, because to do so constitutes an unlawful discrimination against the owner of the full-value assessed property.... Moreover, a state which has adopted a full-value assessment system cannot assess property at more than full value....

*Id.* The legislature cannot reduce the percentage levy on certain classes of property and meet the mandate of uniformity and equality. However, the State Board has done so by manipulating the base values of property through the cost schedules.

**19.** *But see* COOLEY, TREATISE *supra,* at 755 (stating that "just value" is the market value, or the price which the property will bring in a fair market from a purchaser willing to pay the highest price for it). Outside of Indiana, most states have defined "value" as used in constitutional taxation provisions to mean market value. *See, e.g., Killen v. Logan County Comm'n.,* 170 W.Va. 602, 295 S.E.2d 689 (1982); *Arkansas Pub. Serv. Comm'n v. Pulaski County Bd. of Equalization,* 266 Ark. 64, 582 S.W.2d 942 (1979); *Walter v. Schuler,* 176 So.2d 81 (Fla.1965); *State ex rel. Park Inv. Co. v. Board of Tax Appeals,* 175 Ohio St. 410, 412, 195 N.E.2d 908, 910 (1964) ("In essence, the value of property is the amount of money for which it may be exchanged, i.e., the

whether such properties are being treated uniformly and equally.[20]

The State Board contends that under the True Tax Value system, the various classes of property are assessed equally in terms of property wealth. The State Board argues that "[t]he DeBoer study's conclusions about the shift of tax burdens under market value show that true tax value has accomplished its goal of valuing the various classes of property properly in relation to each other." (State Bd. Remand Br. at 16). As the State Board would have it, equality is demonstrated because the DeBoer Report shows the median True Tax Value for single family homes is 49% of fair market value in one county, while the median True Tax Value for single family homes in another county is 86% of fair market value. (State Bd.Ex. 64C at 5; State Bd. Remand Br. at 5 n. 1). Both properties are said to be of equal value under the current system within the category of residential properties because they are physically identical structures. Differences in deviation from fair market value in different counties hardly show uniformity and equality (except, perhaps in an Orwellian sense, where some properties are "more equal" than others).

Remarkably, the State Board attempts to verify equality in terms of market data. Leaving aside the question of whether the disparate levels of assessment are "proper" or instead amount to a de facto classification system, it is clear that the State Board's measure of equality is the market value data in the DeBoer report. While the Court does not concur that these comparisons demonstrate equality, the Court finds that they demonstrate that even the State Board has not identified any other way to measure equality of taxation on the various classes of property, except by using real world, market information. Three economists, Dr. Zorn (Tr. at 912–13), Dr. Grimes (Tr. at 296) and Dr. DeBoer (DeBoer Dep. at 55–56) joined the State Tax Commissioners (Tr. at 150, 642, 1479) in being unable to identify any way other than market information to measure whether the various classes of property are being assessed equally under True Tax Value.

In contrast to assessments based on True Tax Value, property assessments based on fair market value are objective valuations. Inherent in fair market value is, inter alia, the proposition that property is valued at its highest and best use.[21] A valuation system based on highest and best use is not required in Indiana. What is required, however, is a value that objectively measures property wealth. No evidence has been presented to the Court, nor has the Court found any other method of measuring property wealth other than with reference to market factors. There are three recognized methods of determining value using market data:[22] 1) the comparable sales approach, 2) income capitalization, and 3) reproduction cost minus de-

sales price."); *Parker County v. Spindletop Oil & Gas Co.*, 628 S.W.2d 765 (Tex.1982).

**20.** Recent legislation seems to have allowed the State Board the opportunity to address some of the flaws in the current system. An amendment to the Indiana Code authorizes the State Board use of real world data:

> In the preparation of rules, regulations, property tax forms, and property returns, the state board of tax commissioners may consider:
> (1) data compiled by the federal government;
> (2) data compiled by this state and its taxing authorities;
> (3) data compiled and studies made by a state college or university;
> (4) generally accepted practices of appraisers, including generally accepted property assessment valuation and mass appraisal principles and practices;
> (5) generally accepted indices of construction costs;

> (6) for assessment dates after February 28, 2001, generally accepted indices of income accruing from real property; and
> (7) any other information which is available to the state board of tax commissioners.

IND CODE ANN. § 6–1.1–31–3 (West Supp.1997)

**21.** Property's highest and best use is defined as "the use of the land which will bring the greatest economic return over time." BLACK'S LAW DICTIONARY 655 (6th ed. 1990).

**22.** A system of property assessment must have some means of expressing the value of the property in terms of dollar figures. "Market prices are often viewed as the best measure of the value of a good or service. Market prices can be determined objectively, and generally cannot be manipulated. Thus, market prices are often relied upon to generate unbiased, independent measures of value." HENRY N. BUTLER, ECONOMIC ANALYSIS FOR LAWYERS 183 (1998).

preciation. *See* GLENN W. FISHER, THE WORST TAX? A HISTORY OF THE PROPERTY TAX IN AMERICA 194–97 (1996); JOAN YOUNGMAN, LEGAL ISSUES IN PROPERTY VALUATION AND TAXATION: CASES AND MATERIALS 34 (1994).

Market information influences all three methods of valuation because each of these methods is tied to some type of real world data. For example, true reproduction cost is measured by the fair market value of lumber, bricks, mortar, and other materials, as well as labor. The cost of these items is dictated by the marketplace. The comparable sales approach uses data from actual sales in the real world to determine a property's value. Lastly, the income capitalization approach assigns a value to a particular piece of property based on its ability to generate income. This method is based on real world data. The return that a particular property will give is dictated by what the market will pay for the goods and/or services the property can produce.[23]

There are several methods of equitably and objectively valuing property that do not necessarily consider only the "highest and best use" of the property. One such valuation method, commonly used for agricultural land, is a strict income capitalization method using the actual data from the property to calculate the actual income. *See* ARTHUR O'SULLIVAN ET AL., PROPERTY TAXES AND TAX REVOLTS 29 (1995). The income capitalization method clearly considers the current use while objectively and justly valuing the property for taxation purposes. Some states have adopted "circuit-breaker" programs which provide a tax break after property taxes exceed a certain level of "acceptable" burden. *Id.* at 27. There are many creative ways to utilize common assessment and valuation techniques which would not violate the Indiana Constitution's just valuation requirement. Several states currently employ these methods to value property only at its current use value. *Id.* at 22.

The difference between a valuation based on strict fair market value and a just valuation allowed under Article X, section 1 may be demonstrated by considering farm land located in or near a metropolitan area. The value of the land measured at its highest and best use may be far higher than its value measured at its current use as farm land. If the land were valued using an income capitalization method, the property wealth could be measured at its current use. Either method could result in a just value, and both are measured by objective evidence. The Indiana Constitution allows the legislature discretion in determining whether property is to be valued at its current use or highest and best use.[24]

As the Supreme Court explained, the Indiana Constitution delegates to the legislature the power to implement the uniform and equal clause of Article X, section 1:

> The second clause of Article X, Section 1, requiring the General Assembly to "prescribe regulations to secure a just valuation for taxation of all property," has been interpreted to authorize substantial, but not unlimited, legislative discretion in the methods utilized to achieve the standards of uniformity and equality of rates of assessment and taxation.

*St. John II*, 675 N.E.2d at 327; *see also id.* at 329 n. 7 (Shepard, C.J., dissenting). Additionally, the Supreme Court stated that Article X, Section 1 does not "immunize legislative policy judgments from judicial oversight, but rather establishes mandatory minimum requirements for our system of property assessment and taxation." *Id.* at 324. Therefore, a just valuation of property wealth must utilize objective data. This would satisfy the intent of the framers by ensuring that property is valued at its actual worth. Further, it would allow this Court, the Indiana Supreme Court, and, most importantly, the taxpayers of Indiana the ability to personally evaluate

---

23. Although these three methods use market information, the valuations obtained by using these methods are capable of great variation. There may be a difference between the cost of the labor and materials used to construct an improvement and the comparable sales of similar improvements.

24. While the legislature is given wide discretion in implementing assessment and valuation technique, any method must comport with the uniformity and equality provisions of Article X, section 1.

an assessment in the simple manner utilized by the framers of our Constitution—a common, real world, knowledge of property values.

Although the current system may result in some accurate assessments by happenstance, this does not save the True Tax Value system from its fatal flaws. *Article X, section 1 requires actual, objective valuation—not verisimilitude.* We can indeed see that a piece of property is being assessed at $100,000. We can also observe that the tax based on this value is not confiscatory. However, this observation does not allow the taxpayer or the Court to evaluate an assessment to discern if it is a just valuation based on actual property wealth. The State Board's position is that the True Tax Value system is a measure of the "value in use" of property, is the most equitable way to determine the wealth of property in Indiana, and is therefore constitutional under Article X, section 1.

The State Board is incorrect. The State Board's claim that the True Tax Value system measures value in use, or that it uses *any method* to determine property wealth, is a fiction. The State Board's spokesperson (Mr. Bisch) on the application of the regulations made the point clearly:

Question by Mr. Atherton: I understand your confusion. Does true tax value mea-

sure the wealth of the owner of real property?

Answer by Mr. Bisch: What do you mean by that?

Q. Does it have any—does it measure in any way the wealth or ability to pay in any aspect of the owner of the real property?

A. The wealth meaning how much an individual is actually worth?

Q. Or how much the property is worth.

A. How much the property is worth?

As far as the individual is worth, no. How much the property is worth, because the land values on most lands are done under more of a market standard for review, then my answer would be probably so. Improvements, no.

(Bisch Dep. Vol. I at 88–89).

Applying arbitrary figures, rules, and regulations—the cost schedules found in IND.AD-MIN.CODE tit. 50, r. 2.2—is not an application of the reproduction cost minus depreciation *method.*[25] Placing a specific value of $495 per acre on agricultural land is no valuation method at all. As used both currently and by the framers of the Indiana Constitution, "valuation" means "the act or process of valuing or of estimating value or worth." PHILIP GOVE, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2530 (1981).[26] Valuation is not simply choosing

**25.** As noted above in footnote 5, the cost schedules effective for the 1989 general reassessment reflect 1985 reproduction costs which were then reduced across the board by fifteen percent and fixed as final. Such fixing of valuation has been struck down as unconstitutional in a number of states. *See, e.g., People v. San Francisco Sav. Union,* 31 Cal. 132 (1866) (Valuation by assessor is essential to validity of a property tax); *Aldrich v. Harding,* 340 Ill. 354, 172 N.E. 772 (1930) (Assessing body with right and duty to exercise judgment in determining value has no right to fix valuation by will alone); *Slaughter v. City of Louisville,* 89 Ky. 112, 8 S.W. 917 (1889) (Essential to the validity of ad valorem taxation is that there should be an assessment, and the tax-payer is entitled to be heard in fixing the valuation); *Morgan's R.R. & Steamship Co. v. Board of Reviewers,* 41 La.Ann. 1156, 3 So. 507 (1889) (No rigid rule for the valuation of property exists since it is affected by circumstances that no rule can foresee or provide for); *New Orleans Cotton Exch. v. Board of Assessors,* 39 La.Ann. 95, 1 So. 272 (1887) (In the face of evidence indicating lower value, construction cost alone is not a

proper test of present actual value); *New Orleans Cotton Exch. v. Board of Assessors,* 37 La.Ann. 423 (1885) (Since assessors act judicially in making assessments, they must proceed upon inquiry and use all information before them to determine value of property).

**26.** The Court has consulted numerous dictionaries with regard to the meaning of "valuation." The result is unanimous. From the time of Dr. Samuel Johnson and his first English language dictionary, valuation has been defined as involving someone or something actually *acting* to evaluate or determine the property's "worth." SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE (London, J & P Knapton, 1st ed. 1755); SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE 992 (Boston, West & Blake, 9th ed. 1805); JAMES BARCLAY, COMPLETE AND UNIVERSAL ENGLISH DICTIONARY 946 (London, J. Rivington & Sons, 1815); NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 989 (Springfield, George & Charles Merriam, rev. ed. 1854); 12 THE OXFORD ENGLISH DICTIONARY 29–30 (1933); WILLIAM NEILSON, ET AL., WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE EN-

figures and numbers from a menu—more action and evaluation on the part of assessors is required. The cost schedules are arbitrary figures and formulas, determined by the State Board and applied to property by local assessors with little or no reference to actual value or worth. Certainly arbitrary rules and figures do not measure value in use. The State Board must measure property wealth in order to meet the dictates of the Indiana Constitution. This can only be done through the application of objective data and an application of real world factors affecting property values. *See Woodbridge v. City of Detroit*, 8 Mich. 274, 301 (1860) (Christiancy, J.) (Compelling individuals to contribute money or property to public use without reference to any objective standard, and without requiring sums paid by one kind of property to bear any relation to another kind is a forced contribution, not a valid tax.).

IND.ADMIN.CODE tit. 50, r. 2.2–11–5 (1996) also demonstrates that True Tax Value does not measure value in use. The regulation instructs assessors as to which schedule to use in estimating the replacement cost of structures used for commercial and industrial purposes. Assessors regularly encounter buildings originally constructed as residences, but which have been converted to a commercial use, such as a funeral home or an office. In such a case, IND.ADMIN.CODE tit. 50, r. 2.2–11–5 provides, "If the improvement involved is either a dwelling or a converted dwelling, it would be more appropriate to use the residential pricing schedules in computing reproduction cost." Thus, it is the physical characteristics of an improvement, not its use, which governs reproduction costs.

In *Herb*, the taxpayer complained that property, which was used as a warehouse and distribution center, had been reclassified by the State Board from "truck terminal" to "light warehouse," thereby increasing the assessment. The taxpayer contended that "valuing a building based on its use violates the Indiana Constitution." *Herb*, 656 N.E.2d at 893. The Court did not reach that contention because the evidence established that "Herb's building was assessed based not on its use, but rather on its physical features." *Id.* at 894.

Thus, while the model names are reflective of use, the model specifications actually reflect the physical features that are incorporated into the structure. Indeed, both the State Board hearing officer assigned to this case, as well as State Board Commissioner Gordon McIntyre testified at trial that the actual use of the property is not a determinative factor in selecting the appropriate model, but merely a starting point. As a result, the model that most closely resembles the subject improvement with respect to physical features is to be used, regardless of the model's name.

*Id.* at 893.

The system currently used by the State Board does not result in an actual valuation of property wealth in Indiana.[27] Rather than using objective standards to value property as required by Article X, section 1 of the Indiana Constitution, the True Tax Value system uses arbitrary dollar values, rules, and regulations to arrive at the values it currently uses to assess tax. Therefore, the current system does not accurately measure property wealth. Furthermore, Indiana's current system of property tax assessment does not result in a uniform and equal rate of taxation. The State Board must revise the current property tax scheme to bring it into

GLISH LANGUAGE 2814–15 (2d ed. 1941); DAVID GURALNIK, WEBSTER'S NEW WORLD DICTIONARY 1568 (2d college ed. 1980); EUGENE EHRLICH, ET AL., OXFORD AMERICAN DICTIONARY 767 (1980).

27. As has been shown, there are three recognized valuation methods—comparable sales, reproduction cost minus depreciation, and income capitalization. These three methods are only a means to an end. The Court recognizes the fact that some valuation methods are inappropriate for some types of property. For example, it is ludicrous to use reproduction cost minus depreciation as a means of valuing a vacant lot. However, the Court does not hold that the State Board may not choose to assess certain property by certain methods to the exclusion of others. It only holds that where the taxpayer challenges an assessment, the assessing official must consider the evidence the taxpayer proffers and provide a legitimate reason for discounting that evidence. The Court, on appeal, will review the decision to discount such evidence on its customary standard of review.

compliance with the Indiana Constitution.[28]

While finding that True Tax Value is unconstitutional under Article X, section 1 would normally be dispositive of this case, the Court was instructed by the Supreme Court to consider and determine those claims of the Petitioners that have not as yet been addressed. *St. John II*, 675 N.E.2d at 319. The Court now turns to Petitioner's claim that the True Tax Value system fails to provide ascertainable standards, thereby rendering tax assessments arbitrary and capricious in violation of the due course of law clause of Article I, section 12 of the Indiana Constitution. The Court will then analyze Petitioner's federal claims.

## Article I, Section 12 and Due Course of Law

Petitioners also challenge the True Tax Value system on due course of law (due process) grounds.[29] IND. CONST. art. I, § 12. They contend that the True Tax Value system lacks due process. Petitioners provide anecdotal evidence of individual cases, but maintain that the system is unconstitutional with respect to taxpayers in general. Petitioners argue:

> Unfortunately, when Indiana cut loose its property tax ship from the mooring of fair market value, its vessel became hopelessly adrift in a virtual Sargasso Sea of ipse dixits. The resulting "system" violates the Supreme Court's basic due process jurisprudential tenant [sic] [tenet] that government act uniformly and with regularity based as much as reasonably possible on objective standards rather than subjective whim or caprice.

(Pet. Post–Trial Br. at 43) (footnote omitted).[30]

Article I, section 12 of the Indiana Constitution provides in relevant part that "every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law." IND. CONST. art. I, § 12. Due course of law (due process) imposes limits on governmental decisions that deprive individuals of life, liberty, or property interests within the meaning of the Indiana Constitution. The Court has previously found that the "[e]xtraction of a tax, ... constitutes a deprivation of property, and states must provide procedural safeguards against the unlawful extraction of a tax in order to satisfy the commands of due process." *Dalton Foundries, Inc. v. State Bd. of Tax Comm'rs*, 653 N.E.2d 548, 553 (Ind.Tax Ct.1995) (citing *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 36, 110 S.Ct. 2238, 2250, 110 L.Ed.2d 17 (1990)). The State Board does not contend that due process is inapplicable to taxpayer appeals. Rather, it contends that the True Tax Value regulations provide all the process that is constitutionally due.

The Court has previously held that in order to satisfy due process,

> an administrative decision must be in accord with previously stated, ascertainable standards. This requirement is to make certain that *administrative decisions are fair, orderly and consistent rather than irrational and arbitrary.* The standards should be written with sufficient precision to give *fair warning as to what the agency will consider in making its decision.*

28. The key here is objectivity. The Court is not interested in reviewing the legislature's or the State Board's theory of value. Whether the State Board takes as its textbook Henry Butler, Gil Klose, Adam Smith, Herbert Spencer, John Maynard Keynes, Max Weber, Karl Marx, Friedrich Engels, Mao Tse-tung, Karl Polanyi, Immanuel Wallerstein, or Jürgen Habermas is not the Court's concern. Even the most radical Marxist labor theory would still provide taxpayers and the Court with some type of objective yardstick with which to measure property wealth.

29. "As many recent cases indicate, the Indiana Due Course of Law requirement of Article 1, Section 12 of the Indiana Constitution is analogous to the Due Process Clause of the Fourteenth Amendment." *Haimbaugh Landscaping, Inc. v. Jegen*, 653 N.E.2d 95, 104 (Ind.Ct.App.1995), *trans. denied* (footnote omitted).

30. Petitioners do not discuss the distinction between a due process challenge that is facial or as applied. *See Helton v. State*, 624 N.E.2d 499, 509 (Ind.App.1993) (explaining the difference between a facial challenge and an as applied challenge). Their federal constitutional arguments suffer from this malady as well. *See Reno v. ACLU*, —— U.S. ——, ——, 117 S.Ct. 2329, 2350, 138 L.Ed.2d 874 (1997) (same). Therefore, the Court will discuss both types of challenges.

*Harrington v. State Bd. of Tax Comm'rs,* 525 N.E.2d 360, 361 (Ind.Tax Ct.1988) (emphasis added) (quoting *Podgor v. Indiana Univ.,* 178 Ind.App. 245, 258, 381 N.E.2d 1274, 1283 (1978) *trans. denied* ). *See also Mechanics Laundry & Supply, Inc. v. Department of State Revenue,* 650 N.E.2d 1223, 1233 (Ind. Tax Ct.1995); *Harlan Sprague Dawley, Inc., v. Department of State Revenue,* 605 N.E.2d 1222, 1232 (Ind.Tax Ct.1992); *Hill v. State Bd. of Public Welfare* 633 N.E.2d 352, 355 (Ind.Ct.App.1994); *Riggin v. Ball State Univ. Bd. of Trustees,* 489 N.E.2d 616, 627 (Ind.Ct.App.1986). The ascertainable standards requirement is actually a hybrid mix of procedural (fair warning) and substantive (consistent rather than irrational) due process, which has developed in Indiana. This idea implies that government agencies and the courts themselves must operate according to known rules and procedures. Agency promises of social and economic justice are certain to be unfulfilled unless such agency regulations can be translated into legal rights protected by courts free to apply known rules. What is required is a broad understanding of legal rights, how they have been gained, and how they may be lost. The preservation of due process may be the only means of preserving the enjoyment of private rights and personal freedoms.

■ The Court has further recognized that Indiana's approach to the due process requirements of administrative agencies underscores the idea that " '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Clifft v. Department of State Rev.,* 641 N.E.2d 682, 691 (Ind.Tax Ct.1994) (quoting *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)), *rev'd in part on other grounds,* 660 N.E.2d 310 (Ind.1995).

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Since the unique "ascertainable standards" requirement of Indiana due process was addressed specifically by the Petitioners, the Court will treat it separately from the Petitioner's federal due process claims under the Fourteenth Amendment. However, because the Indiana Due Course of Law requirement of Article I, section 12 is analogous to the Due Process Clause of the Fourteenth Amendment, *Haimbaugh,* 653 N.E.2d at 104, the Court will incorporate in its analysis those cases interpreting federal due process requirements.

### Ascertainable Standards

■ At first blush, the State Board's procedures seem to satisfy the requirements of due process. Following a general reassessment, taxpayers are given a variety of opportunities to challenge their taxes, first at the county level, then by petitioning the State Board for review, and eventually by appealing to this Court. *See* IND.CODE ANN. §§ 6–1.1–15–1 to –4 (West Supp.1997). However, such procedures must not only exist, they must also provide an opportunity to be heard "in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976).[31] It is the lack of ascertainable standards in the current system that deprives taxpayers of just such an opportunity.

The voluminous evidence presented to the Court demonstrates that the State Board regulations fail to provide ascertainable standards to guide the discretion of assessing officials and to measure the fairness of administrative action. Taxpayers as a whole are denied a meaningful opportunity to chal-

---

**31.** During the remand hearing, the court raised issue of whether the hearing provided at the initial stages of the Land Valuation Order (IND.CODE ANN. § 6–1.1–4–13.6; IND.ADMIN.CODE tit. 50, r. 2.2–4–3(a) (1996)) met the requirements of due process. (Remand Tr. at 76–78). The Court's concern was that while taxpayers are provided with a hearing before a county commission at the early stages of the process, they do not have a hearing before the State Board (the final decisionmaker). While the State Board baldly asserted that the county-level hearing comports with the requirements of due process, the Court remains unconvinced. Such a hearing is not at a meaningful time, and does not satisfy the requirements of *Mathews v. Eldridge.* It would seem that the legislature has addressed this problem with an amended version of section 6–1.1–4–13.6, which becomes effective in 1998. The new version gives the county commissions final say as to land value.

lenge their taxes on any objective basis. The following are some examples of the lack of ascertainable standards raised by the Petitioners at trial.

### 1. Neighborhood Desirability

The State Board regulations provide the following "guidance" to determine neighborhood desirability: "a composite judgment of the overall desirability based on the condition of agreeable living and the extent of residential benefits arising from the location of the dwelling." IND.ADMIN.CODE tit. 50, r. 2.2–7–7.1(g)(20) (1996). Desirability is measured by the desires "of the average person." (Bisch Dep. Vol. I, at 123). Testimony by the witnesses indicated that there were no objective standards by which anyone's opinion of neighborhood desirability could be measured or judged. (Tr. at 221, McIntyre; Tr. at 358–361, Barczak; Bisch Dep. at 414–417). The State Board conceded that neighborhood desirability is generally "in the eye of the beholder." (Tr. at 192, McIntyre).

▇ Testimony indicated, the State Board only has two options when a neighborhood rating is challenged: view the neighborhood itself and reach its own subjective judgment, or accept whatever recommendation the hearing officer has made. (Tr. at 221, McIntyre). It must be stressed that taxpayers bear the burden of proving that State Board determinations are incorrect. *Corey v. State Bd. of Tax Comm'rs* 674 N.E.2d 1062, 1064 (Ind.Tax Ct.1997). It is in the most rare and egregious instance that the burden can be surmounted in this Court. This burden is nearly insurmountable, and as such constitutes a lack of due process. *See, e.g., Corey,* 674 N.E.2d at 1066 (determination of "average" neighborhood desirability reversed due to presence of hog farm).

One of the petitioners in this case, Mr. Gilday, provides a good example. The first hearing officer to handle Mr. Gilday's appeal recommended a "good" neighborhood desirability. The State Board followed that recommendation. However, when a second hearing officer found the neighborhood was "very good," the State Board reversed itself and

determined the neighborhood to be "very good." However, Mr. Bisch, the second hearing officer, could not identify the facts upon which the determination was based. (Bisch Dep. at 408–414).

The failure to establish any administrative standard forces the decisionmaker to develop his own. Mr. Bisch, when asked what is "prestigious" about a neighborhood, stated that the concept paints a picture in his mind, and from that he develops his own standard in making a decision. (Bisch Dep. at 415–416). Standards based on mental picture painting and the "eye of the beholder" do not comport with any idea of process, let alone constitutionally mandated due process. This not only invites arbitrary decisionmaking—it precludes taxpayers from discerning the standard being applied.

### 2. Neighborhood Boundaries

In addition to the impossibility of measuring vague concepts like "agreeable living conditions," there is the difficulty in defining a neighborhood boundary. (Bisch Dep. at 402–404). Although the definition of "neighborhood" in the regulations does not mention boundaries, the State Board necessarily imposes boundaries in defining a particular neighborhood. Mr. Bisch used a standard for boundaries based on "obvious breaks in similarities" in comparison with "other properties within the immediate neighborhood." (Bisch Dep. at 356–358). Using this definition, he found that the presence of a low income, high rise apartment tower immediately across the street from Petitioner Gilday's "prestigious" property did not affect the value of the Gilday's property since it was outside of his neighborhood boundary.[32] (Bisch Dep. at 404–407).

Petitioners, as they did with neighborhood desirability, challenge the process allowed in determining a neighborhood boundary. They point to the fact that taxpayers have no chance of a meaningful opportunity to challenge a neighborhood boundary's effect on assessments. This is due to the fact that the State Board decides what the land values are in a particular subdivision, and then limits taxpayer appeals to a comparison of proper-

---

**32.** Certainly, this conclusion does not comport with real world experience. To say that property located across the street does not affect values defies common sense.

ties within the same subdivision. *See Vonnegut v. State Bd. of Tax Comm'rs,* 672 N.E.2d 87 (Ind.Tax Ct.1996).

### 3. Condition

There are no objective standards to determine whether an opinion of condition is correct. (Tr. at 193, McIntyre). The regulations' "guidance" for determining condition relative to age is a series of meaningless tautologies such as: "[a]n eighty (80) year old structure with no evidence of wear and tear *relative to its age* is in excellent condition." IND.ADMIN.CODE tit. 50, r. 2.2–7–9 (1996) (emphasis added). The determination of condition has never been reconciled with the determination of grade by the State Board. When asked whether the quality of construction of a building affects its deterioration, Mr. Bisch, the State Board's spokesman on the application of the regulations answered, "I really never thought of that." (Bisch Dep. at 564–65).

### 4. Grade

While some elements of the grade and design table are objective, many are so subjective as to be unclear. The regulations that differentiate between design characteristics provide little useful information and simply highlight the lack of ascertainable standards involved. " 'A' grade dwellings generally have outstanding architectural style ... the detail and ornamentation are aesthetically appealing." IND.ADMIN.CODE tit. 50, r. 2.2–7–6(d)(1) (1996). On the other hand, " 'B' grade dwellings are architecturally attractive ... and the detailing is balanced and harmonious without being excessive." *Id.* tit. 50, r. 2.2–7–6(d)(2). These are to be distinguished from "C" grade dwellings in which "the design has universal appeal and optimal utility." *Id.* tit. 50, r. 2.2–7–6(d)(3). "D" grade dwellings "are [de]void of any architectural detail." *Id.* tit. 50, r. 2.2–7–6(d)(4). These are to be contrasted with "E" grade dwellings—those which are "devoid of architectural design and detailing." *Id.* tit. 50, r. 2.2–7–6(d)(5).

The lack of ascertainable standards is particularly pronounced in the "A" grade classification. There is no guidance in the manual differentiating between an "A" and an "A + 10" dwelling, leaving the decision completely subjective. (Tr. at 204–206, McIntyre). However, the difference is enormous. An "A" dwelling is priced at 160% of base price, and an "A + 10" dwelling is priced at 360% of base price. IND.ADMIN.CODE tit. 50, r. 2.2–7–6(e), (g) (1996). (Tr. at 204–206, McIntyre).

### 5. Economic Obsolescence

Economic Obsolescence is defined as "obsolescence caused by factors extraneous to the property. Also referred to as economic depreciation." *Id.* r. 2.2–1–24. By definition, only "some" commercial and industrial buildings "experience loss of value due to obsolescence." *Id.* r. 2.2–10–7(d) (1996). There are no objective standards used for measuring obsolescence (Ex. 117, Vol II, at 207–09) and, therefore, no way to apply it equally and uniformly. The regulations list six possible causes of economic obsolescence. *Id.* r. 2.2–10–7(e)(2). One cause of economic obsolescence is listed as "decreased market acceptability of the product for which the property was constructed or is currently used." [33] Obsolescence is granted to residential properties only in "extremely abnormal circumstance[s]." *Id.* r. 2.2–7–9 (1996).

In *Western Select Properties, L.P. v. State Bd. of Tax Comm'rs,* 639 N.E.2d 1068 (Ind. Tax Ct.1994), the Court reviewed whether an obsolescence adjustment was based on "ascertainable standards" and whether a parcel of real estate was assessed consistently with similar property of the same classification. Testifying in that case, Mr. Bisch acknowledged that he did not "really have any basis for saying [the proper obsolescence adjustment was] 75 versus 95...." *Id.* at 1073. The Court ruled that the State Board had acted arbitrarily and capriciously in reaching its determination. *See also Thorntown Tel. Co. v. State Bd. of Tax Comm'rs,* 588 N.E.2d 613 (Ind. Tax Ct.1992). There are simply no objective bases for any economic obsoles-

---

**33.** It is surprising that a system that purportedly seeks to differentiate between properties based upon their physical characteristics concerns itself with the economics of owners and factors extraneous to property.

cence adjustment under a system that ignores real world information.

The lack of ascertainable standards in the State Board's procedures, and the differing standards of value that change depending upon the property involved, deprive taxpayers of a meaningful opportunity to challenge their assessments. Furthermore, the numerous subjective factors contained in the regulations fail to provide meaningful guides to gauge the accuracy of assessments. These procedural shortcomings fail to "enable [a taxpayer] to 'mold' his argument to respond to the precise issues which the decisionmaker regards as crucial." *Mathews*, 424 U.S. at 345–46, 96 S.Ct. at 908. This results in the erroneous deprivation of taxpayer's property in violation of the due course of law clause of Article I, section 12 of the Indiana Constitution.

### Objective Evidence

In response to the Petitioners' argument that the regulations violate due process because they fail to provide ascertainable standards, the State Board argues that taxpayers are capable of mastering the system and being successful in State Board proceedings (including Petitioner Wise, who has won 75% of his appeals). The State Board also argues that the Court has been applying and interpreting the rules for over ten years. (State Bd. Remand Br. at 14). Furthermore, the State Board maintains that market value jurisdictions have elements of subjectivity in their regulations, and that no system of property valuation can be totally free of subjectivity. (State Bd. Trial Br. at 36–37). While all of this is true, it does not change the fact that the current system is unconstitutional.

As the State Board notes, states that have market value as a basis of property assessment call for the consideration of subjective factors in neighborhood, grade, and condition in the estimation of market value. The critical difference between the approach of market value states and Indiana is that those states allow objective, ascertainable, real world, market-based evidence by which these subjective judgements can be measured and evaluated. (Tr. at 1208–10, Beres). For example, if lots in one subdivision have a higher price per square foot than lots in a nearby subdivision, market information in terms of sales prices provide strong factual evidence that the first subdivision is in a better neighborhood than the second. This is without regard of any subjective impressions about the degrees of "agreeable living."

It is this very point that underlies the reason why the current True Tax Value system is fatally flawed and incapable of being constitutionally applied. As discussed above, Article X, section 1 requires tax valuation to be based on real world, objectively verifiable data that measures property wealth. The current system is simply the mechanical application of a set of numbers taken from State Board regulations—with subjective adjustments based on assessors knowing something when they see it. *See St. John I*, 665 N.E.2d at 967; IND.ADMIN.CODE, tit 50 r. 2.2 (1996). The True Tax Value system denies taxpayers the opportunity to introduce any evidence of their property wealth outside of the arbitrary figures provided in the State Board regulations. A taxation scheme that is required to value property wealth, but which in turn denies taxpayers the opportunity to introduce evidence indicative of such wealth, is fundamentally unfair.

The State Board's contention that Petitioner Wise prevails in 75% of his appeals before the State Board actually argues against the True Tax Value system. Assuming that the State Board is correct and Wise does not understand the system, (State Bd. Post Trial Br. at 36), Wise's winning 75% of the time indicates that the system is arbitrary. Merely contesting one's taxes should not lead to an automatic change in valuation. This seems to be possible under the current system. Furthermore, due process is not evaluated by the success or failure of a person challenging an assessment.

■ The fact that the Court has been applying and interpreting the rules is equally unpersuasive. First, the Court has a deferential standard. *See* IND.CODE ANN. § 33-3-5-14 (West 1996). Furthermore, in both the amending of its rules and in the application of its regulations the State Board's interpretation "is given great weight unless the agency's interpretation would be inconsistent with

the regulation itself." *State Bd. of Tax Comm'rs v. Two Market Square Assoc.,* 679 N.E.2d 882, 886 (Ind.1997). Given this deferential standard, and the closed, self-referential nature of the State Board's True Tax Value system, the only standard that is ascertainable is one of ipsedixitism: 1) value is whatever the State Board's regulations declare it to be, and 2) the State Board's regulations can be modified and interpreted in any manner that the State Board wishes. Taxpayers are left with little to do other than rage in futility against an autonomous bureaucratic machine.

It is not clear how the rule of law will survive in midst of such a taxation system. While the complexity of modern society has created difficult problems that legislators must try to regulate by statute or that courts must try to solve by case law, this cannot be allowed to evolve into a system of a complete self-directing bureaucracy. By means of a legislative act, experts are authorized to control the actions of certain areas of people's lives. Agencies must issue regulations with the force of law. The regulations, however, are difficult for many people to find and are frequently changed. Moreover, as is the case with the State Board, agencies may be the judge and interpreter of its own administrative rules. The idea of the rule of law now competes with a doctrine of government regulation by administrative orders. A peculiar quality of our common law system is that it still retains respect for due process and for courts administering known rules, rather than trying to divine an image painted in a decisionmaker's mind. *See* ARTHUR R. HOUGE, ORIGINS OF THE COMMON LAW 237–38 (1966).

The True Tax Value system violates due process because it deprives taxpayers of their right to introduce real world, objective evidence in order to challenge assessments. Without objective data, the State Board is free to engage in an arbitrary system of taxation by fiat while informing the taxpayer that such a system is fair and beyond attack. *See Aldrich,* 172 N.E. 772 (Assessing body

with right and duty to exercise judgment in determining value has no right to fix valuation by will alone); *Heth v. City of Radford,* 96 Va. 272, 31 S.E. 8 (1898) (Assessment and valuation of land by commission that does not provide method for taxpayers to challenge valuation violates due process); *McFadden v. Longham,* 58 Tex. 579 (1883) (statute providing for the ex parte determination of tax liability by ministerial officer without hearing violates due process). Until taxpayers are assessed upon a real world, objective measures of property wealth, the True Tax Value system will not be capable of constitutional application.

## FEDERAL CONSTITUTIONAL CLAIMS: THE 14TH AMENDMENT

### DUE PROCESS

#### Discussion

■ The Fourteenth Amendment provides in relevant part that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Due process contains both substantive and procedural elements. Procedural due process requires that taxpayers be provided with notice and a meaningful opportunity to be heard before a tax liability is finally fixed. *Nickey v. Mississippi,* 292 U.S. 393, 396, 54 S.Ct. 743, 744, 78 L.Ed. 1323 (1934); *Turner v. Wade,* 254 U.S. 64, 67, 41 S.Ct. 27, 28, 65 L.Ed. 134 (1920). Substantive due process requires that taxation not be arbitrary, oppressive, or unjust. *Great N. Ry. v. Weeks,* 297 U.S. 135, 152, 56 S.Ct. 426, 434, 80 L.Ed. 532 (1936); *Lawrence v. Mississippi Tax Comm'n,* 286 U.S. 276, 283, 52 S.Ct. 556, 558, 76 L.Ed. 1102 (1932); *Davidson v. New Orleans,* 96 U.S. 97, 107, 24 L.Ed. 616 (1877). Petitioners allege that Indiana's current property tax scheme violates both forms of due process on its face.[34] Each will be addressed in turn.

#### Procedural Due Process

The Petitioners assert that the requirements of procedural due process prevent the

---

**34.** Petitioners do not challenge the True Tax Value system as it applied to any specific petitioner on federal grounds. Therefore, the Court does not address whether a particular application of the current system violates federal due process.

State from finally and irrevocably fixing tax liability without affording taxpayers notice and a meaningful opportunity to be heard. This assertion is based on their view that section 6–1.1–31–6(c) and the State Board regulations deprive taxpayers of a meaningful opportunity to contest their assessments (i.e., tax liability) because certain information is deemed irrelevant for the purposes of determining the assessment. *See Dawkins v. State Bd. of Tax Comm'rs*, 659 N.E.2d 706, 708–09 (Ind. Tax Ct.1995) (State Board free to reject actual reproduction cost in determining reproduction cost). They argue that this operates as an illegitimate conclusive presumption.

In response, the State Board contends that this presumption is actually a substantive rule of law based upon a determination by the Legislature that "just valuation" and

> important policy goals . . . can be met only through a valuation system like "true tax value" and . . . cannot be met through a fair market value system of valuation. "True tax value" has several advantages as a matter of policy. "True tax value" permits the same yardstick—replacement cost—to be applied to all classes of improved property, residential, commercial and industrial. . . . [T]his design ensures that commercial and industrial taxpayers pay their fair share of tax. . . . Fair market value systems permit different yardsticks for different types of property—usually comparable sales for residential; income for commercial; and replacement for industrial.

(State Bd. Br. on Const. Iss. at 8–9). The conclusive presumption inherent in True Tax Value not only expresses the State's "important policy goals" but also furthers them by excluding every fact and circumstance tending to indicate value outside of the State Board's standard of value.

 It is true that certain conclusive presumptions are invalid on federal due process grounds. *See Schlesinger v. Wisconsin*, 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557 (1926) (gift made within certain time of death held to be taxable inheritance); *Heiner v. Donnan*, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932) (same). Outside of the taxation context, *see Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Cleveland Bd. of Ed. v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). However, any substantive rule of law may implicitly make certain evidence irrelevant in determining the ultimate rights of parties. For example, in California, evidence brought more than two years after a child's birth that a certain person is the biological father of the child is irrelevant for purposes of determining the paternity of a child born into a marriage. *See* CAL.FAM. CODE §§ 7540–7541 (West 1994). This "conclusive presumption" was upheld in *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (Scalia, J., plurality opinion). *See also Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (holding rule that any payment agreement having four or more installments is a finance agreement not an improper conclusive presumption).

 It therefore follows that the mere fact that a substantive rule of law deems certain evidence irrelevant does not make that law an invalid conclusive presumption. Consequently, the real issue is not the *procedural* complaint that a meaningful opportunity to be heard is denied due to a conclusive presumption, but rather is the *substantive* question of "the adequacy of the fit" between the governmental policy and the conclusive presumption. *Michael H.*, 491 U.S. at 121, 109 S.Ct. at 2341.

 The Court is unconvinced of the Petitioners' procedural due process argument for a further reason. The State Board is an administrative body that acted legislatively in enacting the regulations that determine what standard of value to use. It did not specifically deny Petitioners a hearing or the use of certain evidence; rather, it enacted a set of generally applicable regulations. Under federal due process, governing bodies may enact generally applicable laws, that is, they may legislate, without affording affected parties notice and an opportunity to be heard. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915). "The fact that a statute

(or statute-like regulation) applies across the board provides a substitute safeguard." *Philly's v. Byrne*, 732 F.2d 87, 92 (7th Cir. 1984) (citing *United States v. Florida E. Coast Ry.*, 410 U.S. 224, 245–46, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973)).

It is likely, as Petitioners assert, that the State Board acted intentionally to shift more of the property tax burden onto businesses and industries in Indiana. Courts have noted that "more [process] may be required ... where the legislation affects only a tiny class of people—maybe a class with only one member." *Philly's*, 732 F.2d at 93. However, the Court does not believe that a generally applicable rule, generated by the fear that one particular group is not bearing its appropriate tax burden, converts the State Board's legislative action into a quasi-judicial act that requires more process. *See Pro–Eco, Inc. v. Board of Comm'rs*, 57 F.3d 505, 513 (7th Cir.1995) (citing *Anaconda Co. v. Ruckelshaus*, 482 F.2d 1301, 1306 (10th Cir.1973) (finding no adjudication, and therefore no need for an individual hearing, where a general rule applied to a class that included only one member but remained open to possible future members and where there was such a community of interest in the regulation as to make rulemaking effective)).

Thus, the Court rejects Petitioners' procedural due process challenge and proceeds to their substantive claim.

**35.** The Court interprets this to mean that some Indiana taxpayers pay more taxes than others with similar properties when the measure of value is market value.

**36.** Petitioners have not raised a challenge under the Takings Clause that the taxation scheme results in such high taxes as to make it confiscatory (an "as applied" challenge). Confiscatory taxation would, of course, violate taxpayers fundamental property rights. But, property as contemplated by the Takings Clause and property as contemplated by the Due Process Clause cannot be coterminous. *See Pro–Eco*, 57 F.3d at 513; Rosalie Berger Levinson, *State and Federal Constitutional Law Developments*, 30 IND.L.REV. 965, 980 n. 136 (1997) If they were, we would end up with former welfare recipients whose benefits the state had otherwise properly terminated claiming that the state must pay them the fair market value of their benefits. *See Goldberg v. Kelly*, 397

## Substantive Due Process

■ Petitioners also claim that the True Tax Value scheme deprives Petitioners of their substantive due process rights. Petitioners maintain that the True Tax Value scheme is arbitrary and violates substantive due process since "many taxpayers, such as Wise and Shelton and those in St. John Township, are paying taxes greatly disproportionate to their market value relative to other Hoosier taxpayers." [35] (Pet.Post–Trial Reply Br. at 26). In order to claim that a law interferes with their substantive rights, Petitioners must be able to demonstrate either that 1) the law infringes "fundamental rights [or] liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, —— U.S. ——, ——, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997) (citations omitted); or 2) the law is "arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926). "Arbitrary and unreasonable" has been interpreted to mean invidious or irrational. *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir.1988); *Burrell v. City of Kankakee*, 815 F.2d 1127, 1129 (7th Cir.1987). As Petitioners have neither hinted at nor provided the Court with "a 'careful description' of the asserted fundamental" rights violated by the state,[36] *see Glucksberg*, —— U.S.

U.S. 254, 255, 90 S.Ct. 1011, 1014, 25 L.Ed.2d 287 (1970) (welfare benefits may not be taken away without giving the recipient notice and an opportunity to be heard); *Schroeder v. City of Chicago*, 927 F.2d 957, 961 (7th Cir.1991) (the Takings Clause does not apply to allegedly improper removal of welfare benefits). In other words, the Due Process Clause recognizes a wider range of interests as property than does the Takings Clause. However, even assuming that Petitioners could show a property interest under the Due Process Clause that the State Board's system has somehow deprived them of, Petitioners cannot show that they were denied due process. As the Supreme Court explained in *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940), the test for due process takings:

is whether property was taken without due process of law, or, if paraphrase we must, whether the taxing power exerted by the state

at ——, 117 S.Ct. at 2268, the Court will review Petitioners' claim under the "arbitrary and unreasonable" standard.

■■■ The State Board has argued that the True Tax Value system "ensures that commercial and industrial taxpayers pay their fair share of tax." (State Bd. Br. on Const. Iss. at 8–9). "[G]overnmental action passes the rational basis test if a sound reason may be hypothesized. The government need not prove the reason to a court's satisfaction." *Northside Sanitary Landfill, Inc. v. City of Indianapolis*, 902 F.2d 521, 522 (7th Cir.1990) (citations omitted). Concern that certain types of property (i.e., commercial and industrial) may not be paying their fair share of the tax burden in a system based on market value is a sufficient reason *on its face* to pass the "arbitrary and unreasonable" test of *Euclid.* In trying to avoid "the systematic overvaluation of residential property in comparison to other classes of property," (State Bd. Remand Br. at 2), the State Board acted in a rational manner. Therefore, Petitioners' substantive due process claim must fail.

## EQUAL PROTECTION

### Discussion

■■■ Petitioners argue that the current property tax scheme is unconstitutional under the federal Equal Protection Clause because it is irrational and produces arbitrary results.[37] Petitioners facial challenge is that "[w]hether measured by market value standards, or on its own nebulous terms, true tax

value does not treat similarly-situated property similarly." (Pet. Post–Trial Br. at 28–29). The Court holds that the Indiana property tax does not violate the Equal Protection Clause.

■■■ The Fourteenth Amendment provides in relevant part that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The United States Supreme Court has explained that this is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Under federal equal protection analysis, absent a showing that the challenged classification involves a suspect class or trammels on fundamental rights, the legislation is presumed valid and will be upheld, so long as the classification is rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. at 3254; *see also Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 2332, 120 L.Ed.2d 1 (1992). In the area of taxation, the states are given especially wide latitude in choosing classifications. *Nordlinger*, 505 U.S. at 11, 112 S.Ct. at 2332. In *Allied Stores, Inc. v. Bowers*, for instance, the Court explained:

> The States have a very wide discretion in the laying of their taxes. When dealing with their proper domestic concerns, and not trenching upon the prerogatives of the National Government or violating the guaranties of the Federal Constitution, the

bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return.
*Id.* at 444–45, 61 S.Ct. at 250.
Although *J.C. Penney Co.* involved an excise tax rather than a property tax, the substantive issue is the same. *See* 2 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW § 13.2 (2d ed. 1992).

**37.** On remand, Petitioners incorporate by reference their arguments before the Supreme Court, including an allusion to Article I, section 23 of the Indiana Constitution. (Pet.Br. on Remand at 24). That section provides: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon

the same terms, shall not equally belong to all citizens." IND CONST. art. I, § 23. The extent of Petitioners' argument in this regard, however, was to quote Article I, section 23 and state brusquely in conclusion that the tax scheme violates the equality provisions of both the federal and state constitutions. (Pet. Supreme Ct.Br. at 28, 32). While Section 23 normally requires an independent interpretation and application from the Equal Protection Clause, *Collins v. Day*, 644 N.E.2d 72, 75 (Ind.1994), no such analysis is warranted where the petitioner fails to present separate and independent authority and argument on the question. *See Games v. State*, 684 N.E.2d 466, 473 n. 7 (Ind.1997); *Rynerson v. City of Franklin*, 669 N.E.2d 964, 966 n. 1 (Ind. 1996); *St. John v. State*, 523 N.E.2d 1353, 1355 (Ind.1988).

States have the attribute of sovereign powers in devising their fiscal systems to ensure revenue and foster their local interests. Of course, the States, in the exercise of their taxing power, are subject to the requirements of the Equal Protection Clause of the Fourteenth Amendment. But that clause imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation. The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. It is not required to resort to close distinctions or. to maintain a precise, scientific uniformity with reference to composition, use or value.

358 U.S. 522, 526–27, 79 S.Ct. 437, 440–41, 3 L.Ed.2d 480 (1959). *See also Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351 (1973) ("Where taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.") (footnote omitted).

### Taxing Different Property Differently

Petitioners first argue that the Indiana property taxation scheme violates the principle of equal protection because, by its terms, different kinds of land are assessed according to different standards and at different rates. As the Court outlined above, commercial, industrial, and residential lands are assessed by county land commissions according to sales data for each county. Agricultural land, on the other hand, is assessed by agricultural land advisory committees in each county. Instead of sales data, the committees start with a base rate of $495 per acre and make adjustments for the capacity of the land to produce crops. Windbreaks, filter strips, forest land, and wildlife habitats or riparian land are not assessed, but are simply taxed specifically at $1 per acre. Finally, improvements on lands generally are assessed according to the State Board's reproduction cost schedules. These schedules purport to track 1985 reproduction costs, reduced fifteen percent across the board. It is important to note that while the assessments for commercial, industrial, and residential lands may tend to approximate current market values due to their reliance on sales data, the legislature makes clear that True Tax Value for all real property "does not mean fair market value." IND.CODE ANN. § 6–1.1–31–6(c).

Petitioners contend that the differences in assessment standards across the different classes of property render the scheme unconstitutional under the Equal Protection Clause. (Pet. Post–Trial Br. at 39–42). Quoting from *State Bd. of Tax Comm'rs v. Lyon & Greenleaf Co.,* 172 Ind.App. 272, 359 N.E.2d 931, 934 (1977), Petitioners state that "a method of valuation 'which does not move towards the goal of securing a just valuation of all property on the principles of uniformity and equality cannot withstand constitutional attack.'" (Pet. Post–Trial Br. at 40). Petitioners emphasize that this is not simply a matter of employing different methods of valuation to approximate market value in each case. Rather, the different sorts of lands are valued under different standards to different ends. According to Petitioners, the True Tax Value system violates equal protection because "it intentionally applies different standards of value to different classes of properties without a rational basis." (Pet. Post–Trial Br. at 41).

The Court is not persuaded by this argument for several reasons. First, Petitioners' reliance on *Lyon & Greenleaf* is misplaced. That case did not involve a federal equal protection challenge. The taxpayer in *Lyon & Greenleaf* argued that an Indiana tax on raw wheat was unconstitutional because it varied depending on who the owner was. The taxpayer owned a grain elevator and complained that it was taxed at a higher rate on its wheat than farmers were. The Court of Appeals agreed that Article X, Section 1 prohibited such a tax. However, this does nothing to advance the analysis under the Equal Protection Clause.[38]

---

**38.** To a certain extent the Petitioners have commingled an equal protection argument with a

Second, many states tax different classes of property at different levels. A 1993 publication by the Institute of Property Taxation shows that thirteen states apply various rates of taxation to different sorts of property. PROPERTY TAXATION, *supra* at 153. In addition, many states have enacted preferential assessments like Indiana's in an effort to prevent the loss of agricultural, forest, and open lands. *See generally* Jane Malme, *Preferential Property Tax Treatment of Land* (Lincoln Institute of Land Policy 1993); David A. Myers, *Legal Aspects of Agricultural Districting*, 55 IND.L.J. 1 (1979); David A. Myers, *Open Space Taxation and State Constitutions*, 33 VAND.L.REV. 837 (1980). Despite the prevalence of differential property taxation, Petitioners were apparently unable to find a single case standing for the proposition that taxing different property differently violated equal protection. In fact, in *Weissinger v. White*, 733 F.2d 802 (11th Cir.1984), the Eleventh Circuit Court of Appeals upheld just such a preferential property tax scheme for agricultural and forest lands. The Court reasoned:

The state is free to enact measures that attempt to perpetuate certain desirable uses of its land in the face of economic pressures to convert the property to other more lucrative pursuits. Institution of a favorable tax system is one rationally related means by which to effect that end.

*Id.* at 806.

Third and perhaps most importantly, the United States Supreme Court has consistently held that states have broad discretion in shaping taxation schemes, and states may "divide different kinds of properties into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable." *Allegheny Pittsburgh Coal Co. v. Webster County Comm'n*, 488 U.S. 336, 344, 109 S.Ct. 633, 638, 102 L.Ed.2d 688 (1989). The Supreme Court has upheld, for example, state distinctions between corporations and individuals, *Lehnhausen*, 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973) (upholding state constitutional amendment exempting individuals but not corporations from the state's ad valorem

uniform and equal argument.

personal property tax); between public service corporations and other taxpayers, *Nashville, Chattanooga & St. Louis Ry. v. Browning*, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254 (1940) (upholding scheme under which railroad's property assessed at full value while other property assessed at less than full value); and even between residents and nonresidents where the state scheme disadvantaged its own residents, *Allied Stores, Inc. v. Bowers*, 358 U.S. 522, 79 S.Ct. 437 (upholding property tax exemption for nonresidents' property held in in-state warehouse while similar property of residents not exempt). Given the deferential approach by the Supreme Court, the Court will not hold the Indiana scheme unconstitutional on equal protection grounds simply because it distinguishes among commercial, industrial, residential, agricultural, and the various preferred land categories.

### Market Value and Equal Protection

█ Petitioners' second argument is that the Indiana scheme violates the Equal Protection Clause because the legislature rendered the system irrational and arbitrary when it divorced the scheme from its foundation in the concept of market value. (Pet. Post–Trial Br. at 28–29). For its part, the State Board concedes that the property tax system no longer attempts to base assessments on market values. The State Board contends, however, that "market value enjoys no constitutional status and is not protected by the Fourteenth Amendment," (State Bd. Post–Trial Br. at 31), and that the current "classifications are rationally related to the legitimate governmental purposes of establishing a property taxation system that is understandable, easy to use, uniform across types of real property, and values like properties alike." (State Bd. Trial Br. at 17). The State Board has the better of this argument.

The Equal Protection Clause does not require the states to base their taxation schemes on market values. While it is true that the Supreme Court has held that a differential valuation of property within the same class may rise to the level of a constitu-

tional violation, *see, e.g., Allegheny,* 488 U.S. at 345–46, 109 S.Ct. at 638–39, the high Court's recent decision in *Nordlinger v. Hahn,* 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) makes clear that equal protection does not mandate taxation according to market values. Equal protection demands only that the *classifications* are rational and that taxpayers are treated equally within the classifications.[39]

The Supreme Court has held several times that the intentional and systematic undervaluation of property violates the principle of equal protection. *See, e.g., Allegheny,* 488 U.S. at 345, 109 S.Ct. at 638–39; *Cumberland Coal Co. v. Board of Revision of Tax Assessments,* 284 U.S. 23, 28–29, 52 S.Ct. 48, 50, 76 L.Ed. 146 (1931); *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 445–46, 43 S.Ct. 190, 191–92, 67 L.Ed. 340 (1923); *Sunday Lake Iron Co. v. Wakefield Township,* 247 U.S. 350, 352–53, 38 S.Ct. 495, 495–96, 62 L.Ed. 1154 (1918).[40] In *Allegheny,* for example, the Supreme Court held that it was a violation of equal protection for a county assessor to value certain real property based on its recent purchase price while making only minor adjustments to the assessments of properties not recently transferred. The evidence showed that the property at issue had been assessed at eight to thirty-five times more than comparable neighboring properties and that these disparities had persisted for more than ten years. *Id.* at 344, 109 S.Ct. at 638. Constrained by the fact that the state constitution and laws demanded that the property tax be applied uniformly in terms of market values, the county argued that its scheme was its best effort to approximate current market values. *Id.* at 343, 109 S.Ct. at 637. Based on the substantial evidence that the county's scheme failed to assess similarly situated property equally over time, the Court found a violation of equal protection. *Id.* at 346, 109 S.Ct. at 639.

Less than four years after *Allegheny,* the Supreme Court upheld what amounted to the same scheme when the Court found that it was supported by legitimate state purposes. *See Nordlinger v. Hahn,* 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).[41] In *Nord-*

**39.** In *Great N. Ry.,* 297 U.S. at 139, 56 S.Ct. at 428, the Supreme Court found that "[t]he full and true value of the property is the amount that the owner would be entitled to receive as just compensation upon a taking of that property by the state or the United States in the exertion of the power of eminent domain." Although Petitioners cite this case as authority for their federal due process claim, this holding that tax value must be market value is clearly inconsistent with *Nordlinger.* Therefore, the Court refuses to follow it.

**40.** The Supreme Court has addressed the question of intentional and systematic undervaluation some thirteen times prior to *Allegheny: Charleston Fed. Sav. & Loan Ass'n v. Alderson,* 324 U.S. 182, 190, 65 S.Ct. 624, 629, 89 L.Ed. 857 (1945); *Cumberland Coal Co. v. Board of Revision,* 284 U.S. 23, 28–29, 52 S.Ct. 48, 50, 76 L.Ed. 146 (1931); *Brinkerhoff-Faris Trust & Sav. Co. v. Hill,* 281 U.S. 673, 678, 682, 50 S.Ct. 451, 453, 454–55, 74 L.Ed. 1107 (1930); *Chicago Great W. Ry. v. Kendall,* 266 U.S. 94, 98–101, 45 S.Ct. 55, 56–57, 69 L.Ed. 183 (1924); *Southern Ry. v. Watts,* 260 U.S. 519, 526, 43 S.Ct. 192, 195, 67 L.Ed. 375 (1923); *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 447, 43 S.Ct. 190, 192, 67 L.Ed. 340 (1923); *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 352–53, 38 S.Ct. 495, 495, 62 L.Ed. 1154 (1918); *Louisville & Nash. R.R. v. Greene,* 244 U.S. 522, 554, 37 S.Ct. 683, 696, 61 L.Ed. 1291 (1917); *Greene v. Louisville & Interurban R.R. Co.,* 244 U.S. 499, 521, 37 S.Ct. 673, 682, 61 L.Ed. 1280 (1917); *Bi-Metallic Inv. Co. v. State Bd. of Equalization,* 239 U.S. 441, 445–46, 36 S.Ct. 141, 142–43, 60 L.Ed. 372 (1915); *Raymond v. Chicago Union Traction Co.,* 207 U.S. 20, 40, 28 S.Ct. 7, 14, 52 L.Ed. 78 (1907); *Michigan Cent. R.R. v. Powers,* 201 U.S. 245, 301, 26 S.Ct. 459, 465–66, 50 L.Ed. 744 (1906); *Coulter v. Louisville & Nash. R.R.,* 196 U.S. 599, 609–10, 25 S.Ct. 342, 344–45, 49 L.Ed. 615 (1905). *See also* Robert Jerome Glennon, *Taxation and Equal Protection* 58 Geo. Wash.L.Rev. 261, 289 & nn. 184–86 (1990).

**41.** In *Allegheny* itself, the Supreme Court expressly reserved the question of whether a state could provide a legitimate rationale for such a departure from market values. The Court stated:

We need not and do not decide today whether the Webster County assessment method would stand on a different footing if it were the law of a State, generally applied, instead of the aberrational enforcement policy it appears to be. The State of California has adopted a similar policy as Article XIIIA of its Constitution, popularly known as "Proposition 13." Proposition 13 generally provides that property will be assessed at its 1975–1976 value, and reassessed only when transferred or constructed upon, or in a limited manner for inflation. Cal. Const., Art. XIIIA, § 2 (limiting inflation adjustments to 2% per year). The system is grounded on the belief that taxes should be based on the original cost of property and

*linger,* the Court reviewed Proposition 13, an amendment to California's constitution adopting a property tax scheme keyed to the value of the property at the time of its acquisition rather than to its current market value.[42] As in *Allegheny,* the scheme in *Nordlinger* was challenged on the grounds that it resulted in wide disparities between property tax assessments and market values. The petitioner in *Nordlinger* introduced evidence that she was paying five times as much in taxes as similarly situated taxpayers. *Id.* at 7, 112 S.Ct. at 2330.[43] Unlike the situation in *Allegheny,* however, the state officials in *Nordlinger* were not constrained by state provisions tying property tax assessments to market values. The people of California had expressly announced their intention to experiment with a new sort of property tax, one not based on current market values. *Id.* at 4–5, 112 S.Ct. at 2329 (describing Proposition 13 as "a property tax revolt" by California voters).

Freed from the concept of market value, the Court examined other possible rationales and had "no difficulty in ascertaining at least two rational or reasonable considerations of difference or policy that justify denying petitioner the benefits of her neighbors' lower assessments." *Id.* at 12, 112 S.Ct. at 2333.[44] First, the Court recognized the state's legitimate interest in maintaining the stability of local neighborhoods by discouraging changes in ownership. *Id.* (citing *Euclid v. Ambler,* 272 U.S. at 395, 47 S.Ct. at 121). Second, the Court found that the state could legitimately act to protect the "vested expectations" of the owners of older homes. *Id.* at 12–13, 112 S.Ct. at 2333. This is to say that the state could legitimately decide that home owners should not be subject to the threat that, due to rising property values, they eventually might not be able to afford to keep their homes. *Id.* at 13–14, 112 S.Ct. at 2333–34 (citing various cases recognizing that states have legitimate interest in protecting reliance and expectation interests).

The Court expressly distinguished *Allegheny* on the grounds that in that case,

---

should not tax unrealized paper gains in the value of the property.
*Id.* at 344 n. 4, 109 S.Ct. at 638 n. 4.

While the Court seems to imply here that the key difference between *Allegheny* and *Nordlinger* lies in the source of the challenged policy, that is, whether the assessment method was a result of state law or merely an "aberrational enforcement" problem, this is not what the Court means. In *Nordlinger,* the Court expressly states that it does not mean to suggest that "the protections of the Equal Protection Clause are any less when the classification is drawn by legislative mandate ... than by administrative action." 505 U.S. at 16 n. 8, 112 S.Ct. at 2335 n. 8.

42. The actual provision froze property assessment values at 1975–1976 levels, capped annual assessment increases at 2%, and created a ceiling of 1% on the property tax rate. *Nordlinger,* 505 U.S. at 5, 112 S.Ct. at 2329. This was then subject to exceptions for new construction and transfers of ownership, which triggered reassessment up to current appraised values. *Id.*

43. She showed as an example that a nearby home of identical size on a larger lot was taxed only $358.20 on an assessed value of $35,820, as compared with her $1,701 tax bill on the $170,-100 reassessed value of her new home. *Id.* at 7, 112 S.Ct. at 2330. She estimated that her contributions to the property tax pool over ten years would amount to almost $19,000, compared to only $4,100 for a comparable home purchased in 1975. *Id.* She also pointed out that her tax was

"only a few dollars short of that paid by a pre–1976 owner of a $2.1 million Malibu beachfront home." *Id.*

In terms of relative contributions to the system, the Court found that "[b]y 1989, the 44% of California homeowners who have owned their homes since enactment of Proposition 13 in 1978 shouldered only 25% of the more than $4 billion in residential property taxes paid by homeowners statewide." *Id.* at 6, 112 S.Ct. at 2329.

44. The Court emphasized that rational basis review did not require state officials to actually articulate their reasons for the practice under scrutiny. 505 U.S. at 15, 112 S.Ct. at 2334. The Court reiterated that it will accept any plausible purpose so long as "that purpose may conceivably or 'may reasonably have been the purpose and policy' of the relevant governmental decisionmaker." *Id.* (quoting *Allied Stores,* 358 U.S. at 528–29, 79 S.Ct. at 442). The Court pointed out that in *Wheeling Steel Corp. v. Glander,* 337 U.S. 562, 69 S.Ct. 1291, 93 L.Ed. 1544 (1949), the Court had refused to entertain additional hypothetical purposes for a statutory exemption from a state's property tax where the state had expressly declared its purpose. *Nordlinger,* 505 U.S. at 16 n. 7, 112 S.Ct. at 2335 n. 7. The Court explained that " '[h]aving themselves specifically declared their purpose, the Ohio statutes left no room to conceive of any other purpose for their existence.' " *Nordlinger,* 505 U.S. at 16 n. 7, 112 S.Ct. at 2335 n. 7 (quoting *Allied Stores,* 358 U.S. at 530, 79 S.Ct. at 442).

there was no indication of an acceptable rationale to support the systematic disparities in assessments. The Court stated that the critical distinction was "the absence of any indication in *Allegheny Pittsburgh* that the policies underlying an acquisition-value taxation scheme could conceivably have been the purpose for the Webster County tax assessor's unequal assessment scheme." *Id.* at 15, 112 S.Ct. at 2334. *See also* Glennon, *supra*, note 41 at 274 (stating that county attorney in *Allegheny* offered no rational basis, in briefs or at oral argument, for disparities and that attorney for petitioners emphasized repeatedly that difference between *Allegheny* and California's Proposition 13 was that California had proffered rational reasons for its tax scheme while West Virginia had not).[45] Thus, a reading of *Allegheny* and *Nordlinger* together, demonstrates that the Equal Protection Clause does not require states to base their property tax schemes on market information or to maintain a specific ratio of assessment to market value. Rather, equal protection demands only that there be a plausible and reasonable explanation for the new scheme and its classifications.

Indiana's True Tax Value scheme will be constitutional under equal protection, then, even though it is not based on market information so long as the scheme's classifications are rationally related to a legitimate state interest *and* nonarbitrary. The State Board contends that the *classifications* employed under its scheme are rationally related to "establishing a property taxation system that is understandable, easy to use, uniform across types of real property, and values like properties alike." (State Bd. Trial Br. at 17). In other words, it is the State Board's position that the True Tax Value system is a worthy experiment in property taxation.[46] While creating more efficient and uniform

systems of property taxation are certainly legitimate state purposes, *see Lehnhausen*, 410 U.S. at 365, 93 S.Ct. at 1006 (upholding state tax exemption for individuals and not corporations in part because state purpose was to make system more fair and efficient), the question is whether the classifications left in place when the concept of market value was removed are arbitrary. The Court holds that they are not under a federal equal protection standard.

▇ In the context of state taxation, equal protection requires only that the classifications are related in a minimal sense to the nature of the property in question and that taxpayers are treated equally within the classes. The Supreme Court has upheld state distinctions between corporations and individuals, *id.* at 364–65, 93 S.Ct. at 1006, among various individuals for inheritance tax purposes, *Magoun v. Illinois Trust & Sav. Bank*, 170 U.S. 283, 293, 18 S.Ct. 594, 598, 42 L.Ed. 1037 (1898), between anthracite coal and bituminous coal, *Heisler v. Thomas Colliery Co.*, 260 U.S. 245, 255, 43 S.Ct. 83, 84, 67 L.Ed. 237 (1922), between oils of different weights or gravities, *Ohio Oil Co. v. Conway*, 281 U.S. 146, 159, 50 S.Ct. 310, 313–14, 74 L.Ed. 775 (1930), and between small businesses and chain stores, *State Bd. of Tax Comm'rs v. Jackson*, 283 U.S. 527, 537, 51 S.Ct. 540, 543, 75 L.Ed. 1248 (1931). Nor is equal protection violated by tax statutes singling out oil wholesalers, *Southwestern Oil Co. v. Texas*, 217 U.S. 114, 121, 30 S.Ct. 496, 498, 54 L.Ed. 688 (1910), railroads, *Browning*, 310 U.S. at 369–70, 60 S.Ct. at 972, or mining operations, *Oliver Iron Mining Co. v. Lord*, 262 U.S. 172, 179, 43 S.Ct. 526, 529–30, 67 L.Ed. 929 (1923). In these cases, the Supreme Court upheld the challenged classifications, not because the states were able to relate each distinction to a particular state

---

**45.** The Court expressly stated that it was not distinguishing *Allegheny* because it involved administrative rather than legislative action or because equal protection required conformity with a state's constitutional provision demanding uniform property taxes. *Id.* at 16 n. 8, 112 S.Ct. at 2335 n. 8.

**46.** Commentators on Indiana's scheme have suggested that the True Tax Value system is designed primarily to enhance administrative efficiency. *See* INSTITUTE OF PROPERTY TAXATION, PROPERTY

TAXATION § 2.10 (Jerrold F. Janata ed. 1993) ("It appears likely that the original purpose behind divorcing the valuation standard from market value was an attempt to enhance administrative convenience."); Larry Y. Stroble & Ronald D'Avis, *Current Issues Affecting Indiana Tax Policy* 22 IND.L.REV. 449, 458 (1989) ("The goals of a property tax system that bases assessment values on rules divorced from market values appear to be related primarily to improving the ease and cost of administration.").

policy, but rather because the classifications were minimally related to the subject of the tax, and taxpayers were treated equally within the classes.[47]

The Court finds that Indiana's True Tax Value system is constitutional on equal protection grounds because the scheme employs traditional property tax concepts like physical characteristics, use, and neighborhood desirability. This is so, of course, because when the legislature separated the taxation scheme from the concept of market value, it retained the traditional categories and classes of the old tax system. Petitioners complain that current scheme lacks a single, unifying rationale. (Pet. Post–Trial Br. at 31–32). Petitioners contend that the True Tax Value system is neither easy to understand, nor easy to administer. This, as Petitioners would have it, proves that the state has no rational basis for the classifications created by the system. The Court has in the past sympathized with those taxpayers mesmerized by the byzantine nature of the State Board regulations. *See 20th Century Fiberglass v. State Bd. of Tax Comm'rs*, 683 N.E.2d 1376, 1378 (Ind. Tax Ct.1997). However, this is not enough to support a determination that the classifications created by the system are not rational (at least as far as equal protection is concerned).

## IRRATIONALITY AND VIOLATIONS OF STATE LAW

■ In both their due process and equal protection challenges, the Petitioners maintain that Indiana's property taxation scheme uses classifications that do not further a legitimate state interest and are hence arbitrary and irrational. Petitioners contend that the classifications created by this scheme violate Indiana law and ipso facto cannot further a legitimate state interest. In support of their argument, Petitioners cite *Allegheny* and Justice Thomas' concurrence in *Nordlinger*.

This is a seductive argument, and for the uninitiated it may be persuasive. However, the case law does not support such a result. In *Allegheny*, the Supreme Court evaluated a county assessor's assessment practices. The county assessor assessed a property owner's property on the basis of a recent purchase price. Other comparable properties, which had not been recently sold, were assessed by making only minor adjustments to previous assessments. This, the Court found, violated the Equal Protection Clause.

In its determination, the Court found it significant that West Virginia law required that property be taxed according to its estimated current market value (thereby creating the standard by which the Court determined which properties were comparable) and that the county assessor's method of assessment resulted in "gross disparities in the assessed value of generally comparable property." *Id.* at 338, 109 S.Ct. at 635. The Court concluded that there was systematic

---

**47.** In *Ohio Oil*, for instance, the Supreme Court held that a "[s]tate is not limited to ad valorem taxation." 281 U.S. at 159, 50 S.Ct. at 314. The Court found such a "contention wholly inadmissible." *Id.* at 161, 50 S.Ct. at 314. Rather, a state may levy a specific tax so long as the category is minimally related to the object of the tax. In that case, the Court upheld a specific tax on oil. The tax was levied per barrel and was graduated according to the gravity of the oil. *Id.* at 151–52, 50 S.Ct. at 311. The petitioner challenged the tax under the Equal Protection Clause, claiming that it distinguished arbitrarily between oils of different gravities. *Id.* at 158, 50 S.Ct. at 313. The Court upheld the state scheme, finding that the concept of gravity, though not directly related to the value of the different oil, was a rational distinction in the context of a tax on oils.

The Court based its finding of rationality on several points. The Court found that the oil industry itself priced the paraffin base oil used in making gasoline according to gravity and that, in fact, the petitioner itself had done so on occasion. *Id.* at 160–61, 50 S.Ct. at 314–15. With regards to the asphalt base oil used to produce lubricating oil, the Court found that because the gravity ratings for this type of oil tended to be low, the fact the tax was uniform below a certain gravity rating, resulted in a fairly uniform tax for this sort of oil. *Id.* at 161–62, 50 S.Ct. at 314–15. Finally, the Court addressed the petitioner's claim that the state could not levy the same tax on oils commanding different prices on the market. The Court rejected that argument, stating that "it cannot be said that the State, from the standpoint of the Federal Constitution, could not put the same specific severance tax on the same sort of oils used in the same way, merely because particular producers of such oils might obtain different prices." *Id.* at 163, 50 S.Ct. at 315.

undervaluation of comparable property, which violated the complaining property owners' equal protection rights.

What the Court did not conclude was that a classification that violated state law necessarily amounted to a federal constitutional violation. Instead, the Court stated that an implicit policy that apparently violated state law [48] would not violate equal protection if it were applied even-handedly. In addition, Petitioners can find no support in Justice Thomas' concurrence in *Nordlinger:* "A violation of state law does not by itself constitute a violation of the Federal Constitution." *Nordlinger,* 505 U.S. at 26, 112 S.Ct. at 2340 (Thomas, J., concurring) (citing *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944)).

Besides the fact that Petitioners' argument finds little support in the relevant case law, the Petitioners argument is unsound for other reasons. First, a rule that a classification that violated state law was a due process or equal protection violation would convert every state law challenge to the legality of a classification into a federal constitutional case. Such a result is certainly antithetical to our federal system. Second, such a rule would allow federal courts to force state actors to follow the federal court's interpretation of state law. *See Evans v. City of Chicago,* 10 F.3d 474, 481 (7th Cir.1993). This flies in the face of well-settled United States Supreme Court precedent. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Obviously, the second concern is not present because this Court is a state court. However, because the Equal Protection Clause is to be construed identically by federal and state courts, *Games,* 684 N.E.2d at 477 (citing *Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975)), the federalism concerns that touch federal courts' interpretation of equal protection rights also touch state courts' interpretation of those rights. Consequently, the Court will not hold that the True Tax Value system violates

the equal protection clause simply because it violates state law.

**CONCLUSION AND REMEDY**

For the foregoing reasons, the Court holds that the Indiana Constitution requires a system of property assessment and taxation based upon a real world, objective measure of property wealth. Accordingly, Indiana's True Tax Value system of property taxation under section 6–1.1–31–6(c) and Title 50 violates the Indiana Constitution, but not the United States Constitution.

The Court orders the State Board to make future real property assessments for purposes of taxation under a system that incorporates an objective reality. The Court recognizes, however, that the current True Tax Value system cannot be changed overnight without causing disorder and confusion in public affairs. The Court is well aware "of the enormous burden born[e] by the State Board in the valuation and assessment of all the property in Indiana." *Harrington v. State Bd. of Tax Comm'rs,* 525 N.E.2d 360, 363 (Ind.Tax Ct.1988). Therefore, the State Board is to be given a reasonable period of time to adopt and implement new regulations that measure property wealth uniformly and equally in the assessment of real property. Furthermore, because the State Board's rule-making authority comes from the Indiana legislature, not this Court, the Indiana legislature may need to enact legislation that will enable the State Board to promulgate the regulations to effect a real property tax system based on an objective, real world measure of property wealth.

Consequently, under a separate order, the Court will schedule a hearing regarding how long the State Board will be given to bring the state's system of real property taxation into compliance with the Indiana Constitution. In the interim: (1) real property tax assessments shall be made in accordance with the current system, (2) any challenges to real property tax assessments shall be

---

**48.** The United States Supreme Court is not the final authority on state law. Consequently, it

cannot speak with absolute certainty on a particular state law issue.

governed by the existing law, and (3) real property tax assessments are not subject to challenge on the ground that the True Tax Value system violates the Indiana Constitution.